IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARREN L. McKINNIS, as )
Executor of the Estate of )
Moses Thompson, Deceased, )
) Case No. 06 cv 4965
Plaintiff, )
) Judge John W. Darrah
v. )
)
UNITED STATES OF AMERICA, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

This case arises out of mental health care provided to decedent Moses Thompson ("Thompson) at the North Chicago Veterans Administration Hospital from December 6, 2001 to June 28, 2002. Thompson's son, Darren McKinnis, brought this action against the United States as the independent executor of Thompson's estate pursuant to the Federal Tort Claims Act. McKinnis alleges personal injuries to and wrongful death of his father. Trial of the case was by the Court without a jury on June 16, 2008. The parties have stipulated that all the elements necessary to hold Defendant liable to Plaintiff under the Federal Tort Claims Act have been established. The only remaining issue is the amount of damages owed by Defendant to Plaintiff.

The Court has considered the evidence, including the testimony of witnesses and exhibits, and has further considered the written arguments and proposed findings of fact and conclusions of law and the authority cited therein submitted by counsel for the parties. The Court has also taken into account: (1) the witnesses' intelligence; (2) the

1

witnesses' memory; (3) the witnesses' ability and opportunity to observe; (4) the witnesses' manner while testifying; (5) any interest, bias, or prejudice of the witnesses; and (6) the reasonableness of the witnesses' testimony when considered in light of all the evidence in the case.

Pursuant to Federal Rule of Civil Procedure 52, the Court hereby enters the following Findings of Fact and Conclusions of Law, which are based upon consideration of all the admissible evidence as well as the Court's determination of the credibility of the trial witnesses. To the extent that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent that matters expressed as Conclusions of Law may be considered Findings of Fact, they shall also be deemed Findings of Fact.

## **FINDINGS OF FACT**

Moses Thompson served his country by enlisting in the United States Army and serving in Vietnam from February 1969 through October 1970. During his service in Vietnam and following his honorable discharge, Moses Thompson suffered from drug and alcohol addictions that plagued him for the rest of his life.

On December 6, 2001, Moses Thompson was admitted to the Acute Evaluation Unit ("AEU") at the Department of Veterans Affairs Medical Center in North Chicago, Illinois (the "VA" or "VA hospital") suffering from an overdose of cocaine and heroin and having suicidal/homicidal ideation. He was 56-years-old at the time, unemployed, and had a history of drug and alcohol abuse, major depression, diabetes and hypertension. Thompson had previously suffered a stroke and prior suicide attempts.

Thompson remained an inpatient at the VA until June 28, 2002, receiving treatment for his drug and alcohol addiction and paranoid schizophrenia. In January 2002, Thompson began leaving the VA hospital on day passes, and plans were being made by the VA to discharge Thompson because he no longer met the requirements for acute in-patient care. He was presented with the prospect of discharge at least as early as January 2002. However, appropriate housing outside of the VA could not be located for him. Thompson expressed to VA personnel an interest in living with his niece, Sherry Burton, with whom he had previously lived, but Thompson could not make contact with Burton as she did not return his phone calls. The VA made other efforts to assist Thompson to find housing, but none were successful. Nevertheless, the VA still planned to discharge Thompson with outpatient follow-up.

On June 28, 2002, at 1:00 p.m., Thompson was discharged from the VA hospital with a one-month supply of medication and his personal belongings, even though the VA had not secured housing for him. Thompson did not want to be discharged. Several hours later, around 3:00 or 4:00 p.m., Thompson returned to the emergency room at the VA intoxicated (he had consumed one pint of alcohol), threatening suicide, and requesting to be readmitted.

The VA refused to readmit Thompson, and he left the emergency room. Thompson, however, returned to the emergency room and insisted that he be readmitted. His request was again refused, and he was told by emergency room staff to find a shelter. Thompson did not leave the VA but, instead, sat in the waiting area of the emergency room. Thompson remained there, untreated, for approximately seven hours until he was

discovered by a security guard unconcious and slumped over in a chair, dead. Thompson had consumed the one-month supply of medication he had received when he was discharged earlier that day.

At the time of his death, Thompson was unemployed and was receiving approximately $900 per month in social security disability benefits. He had not been employed since the 1970s.

To prove damages at trial, Plaintiff presented the testimony of Thompson's two adult children, Darren McKinnis and Dionne Thompson ("Dionne"), as well as the expert testimony of Dr. Edward Wolpert, M.D., Ph.D.

McKinnis and Dionne each testified to a relationship of love and respect with their father. They testified that, although they never lived permanently with their father, they remained in contact with him throughout their lives through visits and phone calls. They each testified they received comfort, guidance and advice from him. McKinnis lived near his father as a boy and visited his father at his father's cousin's home or at his grandmother's home. During his teenage years, McKinnis continued to visit his father, although less frequently than before; and his father counseled him about such things as schoolwork, staying out of trouble and his future. Later, Thompson provided McKinnis guidance and advice about marriage and children. McKinnis respected his father's counsel.

Dionne likewise described her father as a source of emotional support and guidance. Like McKinnis, Dionne's contact with her father lessened over the years as she grew older. As an adult, Dionne moved out of state. She remained in contact with her father through occasional visits and telephone calls.

Both McKinnis and Dionne testified that their father was a private person and did not discuss his personal affairs with them. Neither received financial support from their father. McKinnis and Dionne also both testified that they had phone conversations with their father during the time he was hospitalized at the VA. McKinnis recalled that his father broke down in a conversation about some things he was going through before Thompson suddenly ended the conversation. Dionne testified she had one conversation with her father during the time he was hospitalized. She testified that when she spoke with her father in May 2002, she did not recognize her father's voice, and he seemed disoriented. However, she thought her father just needed time to recover, and she told him that she loved him. Neither McKinnis nor Dionne took any further action regarding their father's situation, and the VA did not contact them. Both testified they were unaware of their father's drug and alcohol problems and did not know that their father did not have a place to live outside of the VA. Both children arranged and participated in their father's funeral.

The qualifications of Plaintiff's expert, Dr. Wolpert, are not disputed. Dr. Wolpert is a qualified expert in the field of psychiatry, psychology and psychoanalysis with experience treating war veterans. Dr. Wolpert based his opinions in this case on his review of the medical records documenting Thompson's treatment at the

VA from December 1, 2001 through June 28, 2002; two depositions; the Lake County Coroner's autopsy report; and the United States life tables for 2004 produced by the National Vital Statistics report.

Based on his review, Dr. Wolpert testified that, in his opinion, Thompson suffered from paranoid schizophrenia and that his death was a suicide. Dr. Wolpert testified that paranoid schizophrenia is a thought disorder in which a person does not have a clear perception of the difference between what is inside and what is outside of his psyche and, because of that, experiences various symptoms causing great distress. According to Dr. Wolpert, the standard of care for this condition includes securing a safe environment for the patient in which the patient feels comfortable and cared for and where the patient feels he has a bond to other people. He testified that the VA's failure to secure for Thompson such an environment upon discharge breached the standard of care and caused Thompson increased anxiety and mental anguish.

Dr. Wolpert testified that Thompson's feelings of rejection and anxiety caused by the VA would have been heightened when Thompson presented himself to the VA after being discharged, stating he was suicidal and asking to be readmitted, but was denied readmission and then ignored by hospital staff as he sat in the waiting room. Dr. Wolpert testified, "This is the most striking example of being ignored that I've ever heard of." According to Dr. Wolpert, Thompson's return to the VA was an attempt by Thompson – ignored by the VA – to be saved from himself.

Dr. Wolpert further testified that Thompson's increased feelings of rejection and anxiety as a result of the VA's negligent conduct did not merely begin upon his discharge on June 28, 2008. According to Dr. Wolpert, the VA's negligent handling of Mr. Thompson's care – including the VA's failing to a provide a secure, stable environment for him outside the hospital – caused an increase in his psychotic symptoms, despair, distress and suicidal thoughts, during the entire period of his hospitalization. He testified that Thompson's feelings of increased anguish and anxiety from not having a place to live upon discharge intensified as his June 28, 2002 discharge approached. These feelings escalated post-discharge to the point that Thompson returned to the VA hospital and took his own life after being refused readmission and ignored by hospital staff.

Dr. Wolpert further testified that, despite Thompson's mental and other health problems, in his opinion, Thompson could have recovered from his mental health disabilities and had a productive and normal life expectancy of 24 years. Dr. Wolpert's testimony was in all regards persuasive and unrebutted.

## CONCLUSIONS OF LAW

The Federal Tort Claims Act makes the United States liable in tort in the same manner and to the same extent as a private individual in like circumstances. 28 U.S.C.§ 2674. An FTCA case is governed by the law of the place where the act or omission occurred, here, Illinois. 28 U.S.C. § 1346. *Campbell v. United States*, 904 F.2d 1188, 1191 (7th Cir. 1990). Plaintiff seeks wrongful death and survivorship damages under Illinois law.

7

Under Illinois law, a wrongful death action is brought to compensate the surviving spouse or next of kin of a decedent for pecuniary loss sustained as result of the decedent's death. *Patch v. Glover*, 248 Ill. App.3d 562, 573 (Ill. App. 1993). Where a decedent has left direct lineal kin, there is a rebuttable presumption that they have suffered some substantial pecuniary loss by reason of the death. *Id.*, at 572. Pecuniary losses include amounts attributable to loss of society, which are damages sustained for the loss of the decedent's "companionship, guidance, advice, love and affection." *Dotson v. Sears, Roebuck and Co.*, 157 Ill. App. 3d 1036, 1052 (Ill. App. 1987). Loss of society does not include recovery for mental anguish. *Bullard v. Barnes*, 102 Ill.2d 505, 514 (1984).

The Illinois survival statute allows a representative of the decedent to maintain statutory and common-law actions that had accrued to the decedent before death. *Nat. Bank of Bloomington v. Norfolk & W. Ry. Co.*, 73 Ill. 2d 160, 172 (1978); *Myers v. Heritage Enters., Inc.*, 332 Ill. App.3d 514, 516 (Ill. App. 2002). Unlike damages for wrongful death, which address the injury suffered by a deceased's next of kin due to their loss of the deceased, a survival action allows for the recovery of damages for injuries personally sustained by the deceased up to the time of death. *Wyness v. Armstrong World Indus. Inc.*, 131 Ill.2d 403, 410 (1989) (citing *Murphy v. Martin Oil Co.*, 56 Ill.2d 423 (1974)).

A plaintiff bears the burden to prove with reasonable certainty the amount of all damages alleged. *See Bennett v. U.S.*, Case No. 03 cv 4051, 2006 WL 495968, at *12 N.D. Ill. Feb. 24, 2006). Further, the Seventh Circuit has directed that in determining such awards, it is useful to consider awards made in other cases to avoid extravagance and abuse. *S.E.C. v. Lipson*, 278 F.3d 656, 664 (7th Cir. 2002).

## DECISION

### *Wrongful Death Damages*

Plaintiff seeks wrongful death damages for the loss of society suffered by McKinnis and Dionne as a result of their father's death.

The testimony of McKinnis and Dionne was generally credible and persuasive to prove that they had a loving relationship with their father and received guidance and emotional support from him in their lives. McKinnis and Dionne are not minor children, and the contact between Thompson and McKinnis and Dionne was not particularly frequent; rather, as is the case with most adult children and their parents, their contact with their father became less frequent. At the time of Thompson's death, their relationship with their father consisted of occasional visits and telephone calls. They knew their father was hospitalized at the VA hospital, but they did not visit him during the time he was hospitalized. It is further undisputed that the children received no financial support from their father, and their father never lived with them.

Nevertheless, it is clear from their testimony that McKinnis and Dionne suffered a substantial loss of society as a result of the death of their father. Based on the totality of the evidence presented, a damage award consistent with awards to adult children in a

9

loving family relationship is appropriate. The parties, however, have cited widely divergent "comparables." In a recent case the government cites, *Spinn v. Milwaukee County Mental Health Complex* (tried 2007) (*Spinn*), three adult children were awarded $45,000 each for their loss of society, when their father, 48-years-old, homeless and with a history of prior suicide attempts, killed himself after being incorrectly assessed and left alone by the defendant after a suicide attempt. The children tesified they had regular familiar closeness with their father, but their father refused to live with them out of pride. On the other end of the spectrum, Defendants cite comparables where jury verdicts of $680,000 and $690,000 were awarded to adult children for loss of society, *Christo v. Heilig Meyers Co.* (tried 2002) (*Christo*), and *Carrasco v. Healthcare and Retirement Corporation of America* (tried 2006) (*Carrasco*). The details of the relationships of the children with their deceased parents in these cases were not stated and could not be determined.

Plaintiff's cases clearly represent verdicts on the high end of the spectrum,[1] and the government's case is more factually analogous. However, the Court finds the award in *Spinn* too low in this case. Instead, the award in *Sheehan v. US*, Case No. 00 C 8013, 2003 WL 21938610 (N. D. Ill. Aug. 11, 2003), another Federal Tort Claims Act case, is instructive. *Sheehan* considered an appropriate award for the loss of society to adult children who lost their 62-year-old father with a projected life expectancy of 18 years. (Here, Thompson was 56-years-old at the time of his death, and Dr. Wolpert testified that

---

[1] Indeed, Plaintiff's exhibits disclose that *Carrasco* "is the highest Illinois wrongful death verdict against a nursing home in JVR records."

he could have recovered from his problems and lived a normal life expectancy of 24 years.) The *Sheehan* court rejected, among other cited comparables, the high award given in *Christo* and found $150,000 to be an appropriate award for the adult children. *See Sheehan*, 2003 WL 21938610, at *18.

This Court likewise finds $150,000 to be an appropriate award for McKinnis and Dionne. While the award is the same as in *Sheehan*, where the deceased father had a slightly shorter life expectancy than Thompson, the same award is appropriate considering all the evidence. McKinnis and Dionne are each awarded $150,000 for their loss of society on their wrongful death claim.

*Survival Damages*

Plaintiff seeks two elements of survival damages: (1) damages for Thompson's emotional pain and suffering; and (2) the value of Thompson's social security disability benefits for the period of his expected life. Plaintiff seeks $2 million for Thompson's pain and suffering and $270,939.00[2] for the value of the social security benefits Thompson would have received over the course of his life.[3]

---

[2] To support this figure, Plaintiff relies on Dr. Wolpert's testimony that Thompson had a life expectancy of 24 years. Although the Government argues a normal life expectancy was unlikely in Thompson's case, the Government did not present evidence contradicting Dr. Wolpert's opinion.

[3] The Government disputes Plaintiff's valuation of the present value of the disability benefits. It is not necessary to determine the present value of the benefits because, as discussed below, these benefits are not recoverable here as survivorship damages.

## Pain and Suffering

Plaintiff is entitled to recover damages for Thompson's conscious pain and suffering prior to his death. *See Murphy v. Martin Oil*, 56 Ill.2d at 431. Dr. Wolpert's testimony is uncontradicted and persuasive: Thompson suffered extreme and prolonged emotional mental anguish and distress as a result of the VA's mistreatment of his condition for months prior to his tragic death. This began at least as early as January 2002, when the VA began to confront him with the prospect of discharge, even though no suitable housing was then or would become available for him. The VA's conduct in this regard culminated on June 28, 2002, when Thompson was discharged with no place to live, refused readmission and died in the emergency room several hours later by consuming the large supply of drugs provided by the VA. As Dr. Wolpert opined, Thompson "had to have [had] increased pain and anxiety and terrible feelings of rejection in order to do such a horrendous act."

The parties' comparables as to the appropriate measure of damages, once again, are widely divergent. However, Plaintiff's cited comparables generally are cases concerning physical conditions and injuries rather than considering pain and suffering associated with mental or emotional conditions, such as that experienced by Thompson.

The Government has provided some useful comparable information in this regard. In *Spinn*, the Court awarded $50,000 after a bench trial for the pain and suffering of a patient who was incorrectly assessed by the defendant after a suicide attempt, left unattended, and who killed himself in the hospital waiting room the same day. In *In Estate of Farver v. Correctional Medical Service of IL Inc.*, (tried 2003), a

23-year-old male inmate committed suicide after his statements that he felt suicidal were not heeded. Punitive damages (not at issue here) were assessed in the case, for a total jury verdict of $1,750,000, with $250,000 being awarded for the inmate's pain and suffering. *See* 2003 WL 23316373 (JVR No. 410873). Although they do not necessarily reflect awards for pain and suffering only, the Government also cites cases where total settlements of $500,000 and $600,000 were reached. *Ranft v. Swedish Covenant Hospital*, 2005 WL 3941258 (Ill. Cir.) (patient was allegedly discharged in unstable psychiatric condition and committed suicide the following week); *Estate of Cassara v. Cast, R.N., et al.*, 1996 WL 778501 (Ill. Cir., JVR No. 189420) (defendants allegedly negligently failed to make required quarter-hour checks on a patient who self-admitted to the hospital and subsequently committed suicide).

*Sanville v. Ivy Scapardine, et al.*, 2004 WL 2843242 (Wis. Cir.), is more on point. There, a jury awarded $600,000 for the pain and suffering of an inmate whose mental conditions were mistreated over the course of many months. The mistreatment began upon the inmate's arrival and caused the inmate to experience tremendous pyschological and physical suffering. The inmate refused to eat, lost an extreme amount of weight, and ultimately committed suicide five months later.

Based on these comparables and the totality of the evidence here, $600,000 is a reasonable award for Thompson's conscious pain and suffering before his death and is generally consistent with comparables provided for pain and suffering associated with the

mistreatment of mental conditions, as occurred here. The award is the same as *Sanville* where the facts are similar: Thompson's pain and suffering lasted for many months in the VA hospital and culminated with his suicide. Plaintiff therefore is awarded $600,000 for Thompson's conscious pain and suffering as survivorship damages.

## Social Security Benefits

Plaintiff has not shown entitlement to Thompson's social security disability benefits as survivorship damages. As stated above, under Illinois law, survivorship damages are for injuries personally sustained by the deceased up to the time of death *as a result of* the defendant's wrongful conduct. See *Wyness*, 131 Ill.2d at 410. Thompson was entitled to receive social security disability benefits for support based on disability until his death. The benefits do not represent losses that Thompson sustained before his death as a result of the wrongful conduct of the VA. Therefore, they are not recoverable as survivorship damages under Illinois law.

The cases Plaintiff cites in support of his request for the disability benefits all considered wrongful death claims. See *McClain v. Owens-Corning Fiberglass Corp.*, 139 F.3d 1124 (7th Cir. 1998); *Naslund v. Watts*, 80 Ill.App.2d 464 (Ill. App. 1967); *Allendorf v. Elgin, J. & E. Ry. Co.*, 8 Ill.2d 164 (1956). The cases do not stand for the proposition that the value of a deceased's disability benefits are recoverable as *survivorship* damages. Thus, had Thompson's children relied on him for support, the children might have been able to assert the loss of Thompson's benefits in their wrongful death claim as damages *they* sustained. See, e.g, *Kwasny v. U.S.*, Case No. 80 cv 2198, 1986 WL 9184, at *15 (N.D. Ill. Aug. 15, 1986) (awarding value of veteran's disability

14

compensation, reduced by amount veteran would have personally consumed, as damages under wrongful death statute). However, it is undisputed that Thompson's children did not rely on him for support; and, indeed, they did not seek the value of their father's social security disability benefits as wrongful death damages in this case. Nor was there any evidence that Thompson would receive any other income during his projected life expectancy. Accordingly, no survivorship damages based on the value of Thompson's social security disability benefits are awarded.

## CONCLUSION

In accordance with the foregoing, Plaintiff is awarded damages in this matter in the amount of $ 900,000.00: $600,000.00 for Thompson's conscious pain and suffering prior to his death, and $150,000.00 for each McKinnis and Dionne for their loss of society. In addition, pursuant to Fed. R. Civ. P. 54(d), costs shall be awarded to Plaintiff as the prevailing party. Judgment is hereby entered in favor of Plaintiff and against Defendant in the amount of $ 900,000.00 plus costs.

Date: December 10, 2008

JOHN W. DARRAH
United States District Court Judge